STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| In re Edward E. Buttolph Revocable Trust | } | Docket No. 19-2-09 Vtec |
| Act 250 Abandonment Petition | } | (Appeal from Dist. #5 Env. Commission) |
| | } | |

## Decision on Motion for Summary Judgment

Edward E. Buttolph, as the Trustee of the Edward E. Buttolph Revocable Trust (hereinafter collectively referred to as "Trust"), attempted for a number of years to subdivide land held in the name of the Trust. Although the initial attempts to obtain state land use approval failed, the Trust received an Act 250 permit in 2003 to subdivide the land into thirteen lots. The Trust's subdivision plans thereafter stalled and ultimately never materialized. Thus, in 2007 the Trust sought to have its Act 250 permit considered abandoned. When the District 5 Environmental Commission ("District Commission") denied its abandonment petition on January 12, 2009, the Trust filed a timely appeal with this Court.

The Trust is assisted in this appeal by its attorney, Donald R. Powers, Esq. No abutter or municipal entity has appeared in these proceedings; the only other entity to appear is the Land Use Panel of the Vermont Natural Resources Board ("NRB"), which is represented by its attorney, John H. Hasen, Esq.

Currently pending before the Court is the Trust's motion for summary judgment, requesting that the Court grant its abandonment petition. The Trust's motion also implicitly requests that the Court determine, as a consequence of the abandonment of its Act 250 permit, that the Trust property is no longer encumbered by the Act 250 jurisdiction that attached as a consequence of its subdivision application and permit. The NRB objects to both of the Trust's summary judgment requests. The parties have filed legal memoranda in support of their respective positions, as well as statements of undisputed facts. We have gleaned the following material facts from the parties' respective filings.

## Factual Background

For the sole purpose of putting the pending motion in context, we recite the following material facts, all of which we understand to be undisputed unless otherwise noted:

1.     The Trust holds title to 104± acres of undeveloped land along Lendway Lane (Town Highway #44), in the Town of Johnson.  The Trust's property has been described as hillside timberland.

2.     Lendway Lane travels along the northwesterly bank of the Lamoille River.  It was once a town trail,[1] but was reclassified as a Class 3 town highway after Mr. Lendway completed some improvements in 1990.  The roadway improvements made Lendway Lane passable during the less forgiving months of the year, particularly during mud season and times of heavy stormwater runoff.

3.     During the 1990s, Mr. Lendway and his family owned the only residences that were served by Lendway Lane; Mr. Lendway purchased his property in 1962.

4.     While the improvements Mr. Lendway made to the road cost thousands of dollars and did alleviate the impassability of Town Highway #44 ("TH #44") during most of the mud season, the road was still in poor condition.  Portions of the buffer or bank between Lendway Lane and the Lamoille River were steep and narrow; the roadway itself was so narrow in several areas as to allow only one car to pass safely; brush and tree growth along the roadway dangerously limited visibility of on-coming traffic; and several "pullouts" had to be used to avoid on-coming traffic at the most narrow segments, where the Lamoille River ran close to TH #44.

5.     The Trust first applied on May 6, 1999, for Act 250 approval of what was then a proposed twelve-lot subdivision.

6.     During the pendency of its first Act 250 application, the Trust caused certain further work to be done on a 1,500-foot section of TH #44, for a total cost of about $15,000.[2]  This road work included the following:

   a.     clearing brush and reshaping road banks for better visibility of on-coming vehicles;

   b.     removing rock and berm to facilitate drainage and improve road width;

   c.     reworking roadside ditches and installing some new culverts;

   d.     filling of low areas in portions of the road; and

   e.     seeding and mulching of disturbed areas.

---

[1]  Town trails are sometimes referred to as class 4 town highways, and more recently referred to as something less than class 4 town highways.  19 V.S.A. § 302(a).

[2]  Based upon this set of facts, we calculate that the Trust's road work cost ten dollars per foot of roadway.

7.      These improvements to TH #44 were done with the permission and under the supervision of the Town of Johnson Highway Department.  The Town performed the final grading on the improved section of TH #44 and supplied some of the culverts the Trust caused to be installed under the Road.

8.      The parties here dispute whether the road work paid for by the Trust would have, in any event, been performed by the Town.  The NRB submitted statements from Town Officials indicating that the Town would not have done this road work, had the Trust not already done so.  In fact, the Town Officials' statements reveal that Mr. Buttolph requested in 1999 that the Town reimburse the Trust for the road work performed, but that the Town Selectboard denied his request at its October 18, 1999, meeting.  Conversely, the Trust offered representations from the Town of Johnson Road Foreman, who indicated that the road work was necessary maintenance.  We do not regard as directly conflicting the statements by the Road Foreman that the work was necessary maintenance and the Town Officials' statements that the Town would not have done the work.

9.      It is undisputed—and the Court relies upon the representation—that the main purpose for the Trust's road improvements was to increase the likelihood that the District Commission would approve its proposed subdivision.

10.     Even after the Trust's 1999 improvements, TH #44 was not considered a consistently passable town highway.  In fact, during a subsequent hearing before the District Commission, Ronald Coltran, a civil engineer with 30 years experience, including as director of public works for several Vermont municipalities, described TH #44 as "the worst Class 3 road he had ever seen."  RE: Edward E. Buttolph Revocable Trust, Application #5L1339, Findings of Fact and Conclusions of Law, at 7 (Dist. #5 Envtl Comm'n Jan. 22, 2001) [hereinafter Dist. Comm'n 2001 Findings).

11.     The Trust's improvements to TH #44 were not significant enough to secure a District Commission determination that TH #44 was adequate to serve the proposed subdivision.  In fact, the Commission specifically denied the Trust's initial application for an Act 250 permit despite these improvements.  In announcing its denial, the Commission noted in its February 24, 2000, Findings of Fact and Conclusions of Law[3] that, even with the then-completed Trust improvements to TH #44, "the use of TH 44 as the access to this residential subdivision will

---

[3]  The Trust supplied a copy of the 2000 Findings as Exhibit 3 to its summary judgment motion.

cause unsafe conditions which are not permissible under [Act 250] criterion 5." RE: Edward E. Buttolph Revocable Trust, Application #5L1339, Findings of Fact and Conclusions of Law, at 14 (Dist. #5 Envtl Comm'n Feb. 24, 2000) [hereinafter Dist. Comm'n 2000 Findings).

12. The Trust thereafter appealed the Commission's Findings to the former Vermont Environmental Board. While the appeal was pending, the Trust proposed to make additional improvements to TH #44, including "the addition of nine inches of new base material to the surface of the town highway . . . [and] the installation of guard posts along a portion of river bank." Dist. Comm'n 2001 Findings at 1.[4] Due to the proposed new improvements to TH #44, the Trust's appealed Act 250 application was remanded back to the District Commission.

13. Upon remand, the District Commission concluded, even after learning of the Trust's pledge to complete further road improvements on TH #44, that it could not grant the Trust's revised Act 250 permit application. Specifically, the Commission concluded that the Trust had failed to show that its proposed subdivision would not cause unsafe road conditions. In fact, the Commission went so far as to note that, "[i]f anything, the parties in opposition have strengthened the record through testimony from expert witnesses that unsafe conditions will result." Dist. Comm'n 2001 Findings at 8. The Trust did not appeal this 2001 permit denial.

14. The Trust next proposed further revisions to its proposed subdivision. The record before us does not include a copy of the District Commission's Findings of Fact and Conclusions of Law on this revised application. However, we were provided with a copy of the District Commission Permit of June 6, 2003.[5] The 2003 Permit approved the Trust's revised subdivision, which now included thirteen lots. RE: Edward E. Buttolph Revocable Trust, Permit #5L1339-1, Land Use Permit at 1 (Dist. #5 Envtl Comm'n June 6, 2003) [hereinafter Dist. Comm'n 2003 Permit]. As best we can discern from the 2003 Permit, TH #44 (presumably with further improvements proposed) continued to serve as access to the subdivision. Id.

15. The parties do not dispute that the Trust has not commenced any construction of the proposed subdivision, nor has the Trust made further improvements to TH #44 since issuance of the 2000 Findings (denying the first application), the 2001 Findings (denying reconsideration of its revised first application), nor since the 2003 Permit (approving its second application).

---

[4] A copy of the 2001 District Commission Findings was submitted with the Trust's summary judgment motion at Exhibit 4.

[5] The Trust submitted a copy of the 2003 Permit as Exhibit 1.

4

16. The 2003 Permit contains several conditions, including that the "permit shall expire three years from the date of issuance if the Permittee has/have not commenced construction and made substantial progress toward completion within the three year period in accordance with 10 V.S.A. § 6091(b)." Dist. Comm'n 2003 Permit at 4.

17. On February 28, 2007, the Trust petitioned the District Commission for the 2003 Permit to be declared abandoned due to non-use. Implicit in its petition, and subsequent filings with this Court, is a request for a ruling that the Trust property is no longer encumbered by the Act 250 jurisdiction that attached as a consequence of its subdivision application and 2003 Act 250 Permit. When the District Commission denied its petition and request, the Trust filed a timely appeal with this Court.

## **Discussion**

When a permittee does not "use" its Act 250 permit for three years following its issuance, the permit is deemed abandoned. 10 V.S.A. § 6091(b). While the language of § 6091(b) infers that abandonment occurs automatically, the NRB, through the rulemaking authority vested in it by 10 V.S.A. § 6025, has wisely established procedures whereby district commissions may decide that an Act 250 permit has become abandoned and void. Specifically, Act 250 Rule 38 provides that "any person who was a party to the application proceedings" may petition the applicable district commission "to declare a permit void." Id. Municipalities and other statutory parties may also petition for the abandonment of an unused Act 250 permit. Id.

Rule 38(A) mirrors the provisions in 10 V.S.A. § 6091(b) in directing how a district commission in the first instance, or this court on appeal,[6] can determine whether a permit has been "used." In order for a permit to be considered "used" by a permittee, "construction must have commenced and substantial progress toward completion must have occurred within the three year period" following issuance of the Act 250 permit. Act 250 Rule 38(A). Thus, the factual issue to be address in this appeal is whether the Trust performed enough construction on TH #44 to consider the efforts "substantial progress toward completion."

For the reasons detailed below, we conclude that there is no factual support—even when viewing the facts presented in a light most favorable NRB, the non-moving party in this

---

[6] This Court is directed in de novo appeal proceedings to "apply[] the substantive standards that were applicable before the tribunal appealed from." 10 V.S.A. § 8504(h).

proceeding[7]—to determine that substantial construction was completed here. We therefore conclude that the Trust's abandonment petition should be granted.

The parties here have thoroughly analyzed the nature, characterization, and significance of the road improvements the Trust completed on TH #44 in 1999. Were we left to make such determinations, we would be required to conduct a trial in this de novo appeal to resolve these factual disputes. But we do not regard such facts to be in dispute, because the significance of the Trust's 1999 road improvements has already been assessed in a prior proceeding by the District Commission. Specifically, when the District Commission reviewed the Trust's first Act 250 application, it determined that the Trust's 1999 road improvements were not sufficient enough to alleviate the annual flooding from the Lamoille River. Dist. Comm'n 2000 Findings at 15. Even with the Trust's 1999 road improvements, the Commission determined that it could not conclude that TH #44 was "suitable for the volume and type of traffic it will experience as the access to a 12 lot subdivision." Id. The Commission concluded that the only manner in which the Trust could receive approval for its proposed subdivision under Act 250 criterion 5 (traffic) was to "design an alternate access to the subdivision other than TH 44 and that the alternative access be constructed . . . prior to any physical improvements on, or sale of, the lots." Id. Since the Trust had completed its 1999 improvements to TH #44 prior to the issuance of the 2000 Findings, the Commission had an opportunity to visit the roadway to conduct a site inspection and get a first-hand perspective of the extent of these pre-permit road improvements.

In 2000, the Commission was not convinced that the Trust's 1999 road improvements were adequate to support the proposed subdivision. Nor was the Commission convinced in 2001 that the substantial additional work offered by the Trust would be sufficient to make TH #44 reasonably safe for this subdivision. See Dist. Comm'n 2001 Findings at 8. The Commission therefore denied the Trust's revised application in 2001. Id. It is undisputed that no work was completed on TH #44 or the subdivision itself after the denial of either the Trust's initial application in 2000 or its revised application in 2001.

There was no appeal taken from the Commission's determination in 2001 that the Trust's already completed road work was insufficient to sustain the proposed subdivision. As such, that determination is final and cannot be challenged in any subsequent appeal to this Court. Berlin Convalescent Center v. Stoneman, 159 Vt. 53, 57 (1992) (explaining that the doctrine of res

---

[7] See V.R.C.P. 56(c)(3); Savage v. Walker, 2009 VT 8, ¶5.

judicata may be applied to regulatory proceedings to bar the re-litigation of final determinations). While that determination was made in the original permit proceeding, now more than nine years ago, we are compelled to conclude that work performed ten years ago and deemed insufficient to support the proposed subdivision can not now be regarded as so sufficient as to prohibit abandonment under Act 250 Rule 28 (A).

The fact that the Trust ultimately obtained approval for a second subdivision application, now incorporating thirteen lots, does not impact upon our legal analysis here. No further work was done on the road or the land since 1999; whatever further work the Trust promised for TH #44 in connection with obtaining a permit in 2003, none of that work was completed—or even started. In short, there is no evidence in the record before us of any work being performed since the first Commission denial in 2000. With these facts, we cannot discern what less a permittee could have done to evidence abandonment of an Act 250 permit.

Where, as here, the undisputed material facts evidence that no substantial work towards completion of a project has begun within the three years following the issuance of an Act 250 permit, a determination of abandonment is mandatory.[8] We therefore conclude, given the undisputed and already litigated facts before us, that the Trust's 2003 Permit has been abandoned.

We next turn to the Trust's request that, given the abandonment of its Act 250 permit, its property should no longer be encumbered by the Act 250 jurisdiction that its subdivision application triggered. Act 250 jurisdiction arises when a development or subdivision is so substantial as to meet the limited definitions of 10 V.S.A. §§ 6001(3)(A) or (19), it therefore requires a permit. See 10 V.S.A. § 6081(a). We note that while the record before us includes a Commission determination that the Trust's previously completed improvements to TH #44 constituted "involved land" for purposes of the Commission's review of the Trust's various permit applications, we have only been made aware of a single trigger for the Act 250 jurisdiction that now encumbers the Trust property: the proposed subdivision of the Trust property. Thus, absent the now abandoned subdivision, the record before us reveals no authorization for Act 250 jurisdiction.

---

[8] Both 10 V.S.A. § 6091(b) and Act 250 Rule 38(A) direct that "non-use of a permit for a period of three years following the date of issuance shall constitute . . . abandonment." 10 V.S.A. § 6091(b); Act 250 Rule 38(A) (emphasis added).

Rule 38(A) does not provide explicit direction that when an Act 250 permit is deemed abandoned, the jurisdiction that flows from that prior permit is also extinguished. But our Supreme Court has accepted the assertion that abandonment equates to cessation of jurisdiction. In re Audet, 2004 VT 30, ¶13, 175 Vt. 617; see also In re Rustin, 162 Vt. 185, 187–88 (1994) (noting that when abandonment is determined, the jurisdiction that arose from the underlying permit ceases).

Act 250 Rule 2(B)(3) directs that a "subdivision shall cease to exist if it is found . . . to have been retracted or revised below jurisdictional levels at any time prior to the construction of improvements on the subdivision." Given our prior determination that no construction sufficient to support the approval of the Trust's application had occurred, and no construction of any manner has occurred since the 2003 permit was issued, we conclude that Rule 2(B)(3) directs that the Trust's proposed subdivision has "ceased to exist" and the Act 250 jurisdiction that the subdivision gave rise to has been expunged.

We decline to adopt NRB's narrow interpretation of Rule 2(B)(3) and 38(A), suggesting that a permittee has no standing to initiate an abandonment proceeding. The very procedures established in Rule 38(A)(1) provide that an abandonment petition "may be filed by any person who was a party to the application proceeding." Since an applicant is a statutory party to any Act 250 proceeding, 10 V.S.A. § 6085(c)(1)(A), the applicant has the right to petition for abandonment. NRB's suggestion that an applicant enjoys no such right, simply because a subsequent Rule provision[9] directs that notice of an abandonment hearing be provided to the permit holder, defies logic and the directive that ordinary rules of statutory construction apply to land use regulations. In re Jenness and Berrie, 2008 VT 117, ¶11. We simply cannot infer the restrictiveness that NRB suggests from a plain and ordinary reading of Rule 38(A).

### Conclusion

For all the reasons more fully discussed above, we conclude that no construction occurred on or related to the Trust subdivision that would prohibit the 2003 Act 250 permit from becoming abandoned. We therefore declare that the Trust's thirteen-lot subdivision has ceased to exist and the underlying Act 250 jurisdiction that the subdivision triggered has extinguished.

---

[9] Act 250 Rule 38(A)(2): "The district commission shall provide at least 20 days' [sic] notice of the [abandonment] proceeding to the permit holder, to all persons who were parties to the permit proceedings, and to the governmental statutory parties listed in Rule 14(A)."

We therefore **GRANT** summary judgment in favor of the Trust and do hereby **GRANT** its abandonment petition.

A Judgment Order accompanies this Decision. This concludes the proceedings before this Court in this appeal.

Done at Berlin, Vermont, this 1st day of October 2009.


_____
Thomas S. Durkin, Environmental Judge